Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>CAROLA DEL MAR ALVARADO VÁZQUEZ<br><br>Apelante | KLAN202401116 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.:<br>E LE2022G0055<br>E LE2022G0056<br>E1TR202200001<br><br>Por:<br>Art. 7.06; Art. 5.07 y Art. 7.02 Ley 22 |

Panel integrado por su presidente, el Juez Sánchez Ramos,[1] la Jueza Santiago Calderón y la Jueza Álvarez Esnard.[2]

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 16 de junio de 2025

Comparece ante nos la señora Carola del Mar Alvarado Vázquez ("señora Alvarado Vázquez" o "Apelante") mediante *Apelación* presentada el 13 de diciembre de 2024. En esta, nos solicita que revoquemos la *Sentencia* emitida y notificada el 14 de noviembre de 2024 por el Tribunal de Primera Instancia, Sala Superior de Caguas ("foro primario" o "foro *a quo*"). Por virtud del aludido dictamen, el foro primario condenó a la Apelante a cumplir, de manera concurrente, una pena de quince (15) y de ocho (8) años de cárcel por infracción a los Artículos 7.06 y 5.07 (C) de *Ley de*

---

[1] Mediante Orden Administrativa OATA-2023-126 se designa al Hon. Roberto J. Sánchez Ramos, por la inhibición del Hon. Juan R. Hernández Sánchez.

[2] Es menester aclarar que la asignación del presente recurso a este Panel Especial responde a la Orden Administrativa OAJP-2021-086, intitulada *Normas para la Asignación de Recursos Nuevos Previamente Presentados en el Tribunal de Apelaciones* emitida el 4 de noviembre de 2021. Se desprende del referido documento que, todo recurso que surja de un caso ante el Tribunal de Primera Instancia el cual, a su vez, haya generado un recurso de revisión apelativa anterior que se haya asignado en o luego del 10 de enero de 2022, "será asignado al panel al cual se asignó el recurso anterior. Ello, independiente de si el recurso anterior estuviera resuelto o pendiente cuando se recibió o asignó el recurso ulterior. Tampoco será impedimento para la asignación **del recurso ulterior la naturaleza de las cuestiones presentadas en los recursos**" (Énfasis nuestro).

*Vehículos y Tránsito de Puerto Rico,* Ley Núm. 22-2000, según enmendada, 9 LPRA sec. 5206 ("Ley 22-2000"). Asimismo, el foro *a quo* condenó a la Apelante al pago de quinientos dólares ($500.00) de multa por infracción al Artículo 7.02 de la Ley 22-2000, *supra,* más el pago de cincuenta dólares ($50.00) por cada centésima adicional sobre el límite de concentración de alcohol dispuesto por la Ley, para un total de trecientos dólares ($300.00). De igual manera, se le revocó la licencia de conducir a la Apelante por un término de cinco (5) años y se le impuso el pago de una pena especial de trecientos dólares ($300.00) al amparo de la Ley Núm. 183 de 29 de julio de 1998, conocida como *Ley para la Compensación a Víctimas de Delito,* 33 LPRA sec. 3214 ("Ley 183") por infracción a los Artículos 5.07 (C) y 7.06 de la Ley 22-2000, *supra,* más una pena especial de cien dólares ($100.00) por infracción al Artículo 7.02.

Por los fundamentos que discutiremos a continuación, **confirmamos** la *Sentencia* recurrida.

## I.

Los hechos que originan la presente controversia se suscitaron el 4 de abril de 2021, cuando el Ministerio Público presentó tres (3) *Denuncias* contra la señora Alvarado Vázquez por violación a los Artículos 5.07(C), 7.02 y 7.06 de la Ley 22-2000, *supra.* Surge de las aludidas denuncias que, el 4 de abril de 2021, la señora Alvarado Vázquez, quien manejaba un vehículo de motor Mercedes Benz, en estado de embriaguez, condujo en contra del tránsito por la carretera 52, kilómetro 21.6, en Caguas, Puerto Rico. Como consecuencia de este acto, ocurrió un accidente fatal, pues el vehículo de la señora Alvarado Vázquez impactó de frente un vehículo marca Jeep, modelo Wrangler, manejado por el señor Ángel Muriel Cirino ("señor Muriel Cirino") quien falleció.

Así las cosas, se determinó causa para arresto contra la Apelante y, posteriormente, el 18 de marzo de 2022, el foro primario

emitió *Resolución Vista Preliminar Regla 23 de Procedimiento Criminal.* Por virtud de esta, se determinó causa probable para juicio por infracción a los Artículos 5.07 (C) y 7.06 de la Ley 22-2000, *supra.* Como corolario de ello, el 23 de marzo de 2022, se emitió *Acusación* contra la señora Alvarado Vázquez en los mencionados delitos. Las aludidas acusaciones disponen lo siguiente:

> La referida imputada CAROLA DEL MAR ALVARADO VAZQUEZ, allá en o para el día 4 de abril de 2021, y en la carretera 52, KM 21.6, en Caguas, Puerto Rico, la cual es una vía pública y forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Caguas, de forma temeraria y con claro menosprecio a la seguridad conducía el vehículo de motor marca Mercedes Benz, modelo GLA250, color gris, tablilla ITI-326, ocasionándole la muerte a otra persona en violación a las disposiciones de la Ley de Vehículos y Tránsito Ley 22. Consistente en que conduciendo dicho vehículo de la forma antes expuesta y bajo los efectos de bebidas embriagantes conduciendo en contra del tránsito, le ocasionó la muerte a un ser humano, ARIEL MURIEL CIRINO.

> La referida imputada CAROLA DEL MAR ALVARADO VAZQUEZ, allá en o para el día 4 de abril de 2021, y en la carretera 52, KM 21.6, en Caguas, Puerto Rico, la cual es una vía pública y forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Caguas, ilegal, a propósito y con conocimiento conducía el vehículo de motor marca Mercedes Benz, modelo GLA250, color gris, tablilla ITI-326, bajo los efectos de bebidas embriagantes, .14% de alcohol por volumen de sangre. Consistente en que conduciendo dicho vehículo bajo los efectos de bebidas embriagantes y conduciendo en contra del tránsito, le ocasionó la muerte a un ser humano, ARIEL MURIEL CIRINO.

Transcurrido un tiempo, el 10 de marzo de 2023, la Apelante presentó escrito intitulado *Supresión de Evidencia.* En este, realizó una síntesis de los testimonios vertidos en la vista preliminar y arguyó que las muestras de sangre que se le habían tomado, se obtuvieron de forma ilegal, sin su consentimiento informado y sin orden judicial. Por tanto, la Apelante razonó que se le violaron sus derechos constitucionales y, por ende, las aludidas muestras debieron ser suprimidas.

Así pues, el 17 de marzo de 2023, se celebró *Vista de Supresión de Evidencia,* y tras someterse el caso, el 23 de mayo de 2023, notificada al día siguiente, el foro primario emitió *Resolución* en la que ordenó la supresión de la muestra de sangre obtenida de

la Apelante. El 25 de mayo del mismo año, el foro *a quo* dictó y notificó *Resolución Enmendada*. En síntesis, resolvió que el consentimiento de la Recurrida a la realización de la prueba de sangre no fue libre y voluntario, y señaló que se presentó evidencia sobre posible coacción.[3]

Oportunamente, y tras varios trámites procesales, el 19 de julio de 2023, el Ministerio Público compareció ante esta Curia mediante *Certiorari* e impugnó la referida supresión de evidencia. Atendido el recurso, el 21 de agosto de 2023, este foro apelativo emitió *Sentencia* en el alfanumérico KLCE202300767. Por virtud de este dictamen, este Tribunal de Apelaciones revocó la *Resolución* recurrida y devolvió el caso ante el foro primario para que procediera de conformidad con lo dispuesto. En síntesis, este foro resolvió que "los testimonios vertidos en la vista de supresión de evidencia no [demostraron] que haya mediado coacción de parte de los agentes del Orden Público al momento de la toma de la muestra de sangre y la firma de las advertencias".[4] Aun insatisfecha, la Apelante acudió al Tribunal Supremo de Puerto Rico mediante *Certiorari*, el cual fue declarado *No Ha Lugar* el 17 de noviembre de 2023.

En conformidad con lo anterior, el foro primario prosiguió con su trámite ordinario, por lo que, los días 4 y 5 de marzo de 2024; 9,10,11,12, 15 y 16 de julio de 2024; y los días 7,9, 12, 13, 16, 22, 27 y 29 de agosto de 2024 se llevó a cabo el juicio por jurado. Cabe destacar que, el Ministerio Público presentó los siguientes testimonios:

1. María Matos
2. Marvik Soto Muriel
3. Agente Luis Montañez Padilla
4. Alexander Cruz Rodríguez
5. Ángel Figueroa Soto

---

[3] Véase, pág. 18, *Resolución Enmendada* dictada el 23 de mayo de 2023 y enmendada el 25 de mayo del mismo año en los casos número E LE2022G0055, E LE2022G0056 y E1TR202200001.
[4] Véase la Sentencia del caso KLCE202300767, pág. 22.

6. Axel Concepción Marcano
7. Ángel González Rivera
8. Maritere Rivera Sanchez
9. Dr. Edwin López Robles
10. Agente Carlos Muñoz Maestre
11. Agente Cecilio Ayala
12. Sonia Andino Ortiz
13. Jessie Rodríguez Montañez
14. Agente Sergio González Rodríguez
15. Marisol González Alvarado
16. Salvador Fabre Rivera
17. Armando Vázquez González
18. Rafael Olivo
19. Maria Conte Miller

Por su parte, la Apelante presentó el testimonio las siguientes personas:

1. Johana Oyola Rosado
2. Ángel Torres Muñoz
3. Mayra Vázquez Morales
4. la acusada, Carola Del Mar Alvarado Vázquez
5. Misael Cuevas Quintana
6. Héctor Delgado Rodríguez

Sometido el caso, las partes expusieron sus respectivos informes finales frente al jurado. Acto seguido, el jurado se retiró a deliberar y el 29 de agosto de 2024, informaron el veredicto mediante el cual, encontraron a la Apelante culpable de todos los delitos que pesaban en su contra. Como corolario de lo anterior, el 14 de noviembre de 2024, el foro primario emitió *Sentencia* y por virtud de esta condenó a la Apelante a cumplir con las siguientes penas:

> **E LE2022G0055 - Art. 7.06 Ley 22** la condena a **15 ANOS cárcel.**
>
> **E LE2022G0056 - Art. 5.07 Ley 22** la condena a **8 AÑOS cárcel. Estas penas se cumplirán concurrentes entre sí.**
>
> **E1TR202200001 - Art. 7.02 Ley 22** la condena al pago de **$500.00** dólares de multa mas [sic] el pago de **$300.00** por el porciento de alcohol en exceso de .08%. **Se revoca** la **licencia de conducir** por el **termino** [sic] de **5 AÑOS.**
>
> Se **IMPONE** el pago de pena especial de **$300.00 Ley 183 en cada caso.**[5]

---

[5] El 10 de diciembre de 2024, se enmendó la precitada *Sentencia* a los únicos fines de corregir la pena especial en el Artículo 7.02 de la Ley 22-2000, *supra*, de trecientos dólares ($300.00) a cien dólares ($100.00).

Inconforme con el resultado, el 13 de diciembre de 2024, la Apelante compareció ante esta Curia mediante el recurso de epígrafe y formuló los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al emitir un fallo de culpabilidad en el caso de epígrafe a pesar de que no se probó la culpabilidad de la acusada más allá de duda razonable.
>
> Erró el Tribunal de Primera Instancia al denegar la solicitud de la acusada de utilizar como testigo a la Sra. Mayra Vázquez Morales quien declararía sobre la forma y manera coaccionada en que se hicieron las advertencias de ley a la acusada al momento del arresto.
>
> Erró el Tribunal de Primera Instancia al denegar la evaluación de la imposición de una pena alterna al encarcelamiento y/o una combinación de estas a la acusada aun cuando no había impedimento en ley para la imposición de una pena alterna en el caso de epígrafe.

El 9 de enero de 2025, esta Curia emitió *Resolución* en la cual, entre otros asuntos, se le concedió a la Apelante un término de treinta (30) días contados a partir de la entrega de la regrabación de los procedimientos para que presentara la transcripción de la prueba oral estipulada ante este Tribunal.  Asimismo, se le concedió a la Apelante, un término de treinta (30) días, a partir de la presentación de la transcripción, para someter el alegato suplementario. De igual forma, dispusimos que la parte apelada en este caso, el Pueblo de Puerto Rico ("Apelado" o "el Estado") debería presentar su alegato en un término de treinta (30) días, a partir de la fecha de presentación del alegato suplementario.

En cumplimiento con lo ordenado, el 27 de febrero de 2025, la señora Alvarado Vázquez instó *Moción presentando Transcripción de Prueba Oral Estipulada,* mediante la cual informó la entrega de la transcripción de la prueba oral junto con ciertas correcciones propuesta por el Apelado. Evaluado este escrito, el 5 de marzo de 2025, esta Curia emitió *Resolución* en la que se le concedió cinco (5) días al Apelado para que certificara la transcripción. En cumplimiento con lo dispuesto, el 12 de marzo de 2025, el Apelado presentó *Moción en Cumplimiento de Resolución* mediante la cual estipularon la transcripción de la prueba oral.  De igual manera,

tras varios asuntos procesales, el 14 de abril de 2025, la señora Alvarado Vázquez presentó *Alegato de la Apelante*. Por virtud de este escrito, agregó un cuarto señalamiento de error el cual se transcribe a continuación:

> Erró el Tribunal de Primera Instancia al emitir un veredicto de culpabilidad por infracción al Artículo 7.06 de la Ley Núm. 22-200, según enmendada, toda vez que el pliego acusatorio carece de los elementos esenciales del delito imputado, por lo que procedía su desestimación y archivo del caso.

Asimismo, resumió los testimonios vertidos en el juicio y expuso su teoría legal del caso. Por su parte, el 14 de mayo de 2025, el Apelado sometió *Alegato del Pueblo de Puerto Rico*. Mediante este escrito, el Estado, de igual manera, resumió la prueba testifical presentada en el juicio, y esbozó que los errores formulados por la Apelante no se cometieron. Con el beneficio de la comparecencia de ambas partes, de los documentos que obran en el expediente, en los autos originales los cuales incluyen la prueba admitida en juicio y de la transcripción de la prueba oral estipulada, procedemos resolver el asunto que está ante nuestra consideración.

## II.
### *A. Apelación Criminal*

En nuestra jurisdicción, "existe el derecho de todo acusado a apelar cualquier sentencia penal que recaiga en su contra". *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022). Por ello, la determinación de culpabilidad del acusado más allá de duda razonable "es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho". *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Esto, pues, "[e]l análisis de la prueba presentada requiere tanto de la experiencia del juzgador como de su conocimiento del Derecho, elementos éstos necesarios para darle a la controversia una solución justa". *Pueblo v. Irizarry*, 156 DPR 780 788 (2002).

La duda razonable, según ha aclarado el Tribunal Supremo de Puerto Rico, "existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colon I,* 182 DPR 129, 175 (2011). Ello no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021) (Sentencia). Solo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón. *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 65 (1991).

De otra parte, "los tribunales apelativos pueden considerar cualquier error de derecho cometido por el Tribunal de Primera Instancia". *Pueblo v. Rivera Ortiz, supra*, pág. 422. Ello incluye errores de derecho que comete el foro primario durante el procedimiento judicial. *Íd.* Esto es así, pues la función de aplicar correctamente el derecho es privativa del juez y es por esa facultad que el tribunal está en libertad de aplicar la norma que estime pertinente y adecuada. *Íd.*

Así pues, "el alcance de nuestra función revisora está limitado por consideraciones de extrema valía". *Pueblo v. Toro Martínez*, 200 DPR 834, 857 (2018). Cónsono con lo anterior, nuestro esquema probatorio se encuentra revestido por un manto de deferencia hacia la adjudicación de credibilidad que realizan los foros de instancias sobre los testigos que declaran ante sí, como a las determinaciones de hechos realizadas por el juzgador. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 911 (2024).

Por otro lado, es norma reiterada que, de ordinario, no se favorece la intervención de tribunales apelativos para revisar la apreciación de la prueba referente a la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad

o error manifiesto. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022). A tenor con lo antes mencionado, el Tribunal Supremo de Puerto Rico ha definido el concepto pasión perjuicio y parcialidad como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio". *Pueblo v. Negrón Ramírez, supra*, pág. 912 citando a *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, 209 DPR 759, 779 (2022).

En cuanto al concepto *error manifiesto*, nuestra más Alta Curia ha determinado que el juzgador de los hechos incurre en dicho error si "aun habiendo alguna prueba que sostenga las determinaciones de hechos del tribunal, el foro revisor razona que se cometió un error, "como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida" (Énfasis suprimido). *Íd.*, págs. 912-913 citando a *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 772 (2013).

Ahora bien, un tribunal apelativo podrá revocar una determinación de culpabilidad realizada por el foro primario si "la prueba no concuerda con la realidad fáctica, es increíble o es imposible" (citas omitidas). *Íd.*, pág. 913. Asimismo, un foro apelativo también podrá intervenir con las determinaciones de hechos y apreciación de la prueba realizadas por el juzgador de los hechos "si se demuestra que éste incurrió en un abuso de discreción al apreciar y adjudicar la prueba presentada ante sí" (citas omitidas). *Íd.* A tono con lo anterior, nuestro Máximo Foro ha destacado que la norma de deferencia apelativa aplica con el mismo rigor cuando lo que se tiene ante la consideración del foro apelativo es un veredicto de culpabilidad emitido por un jurado. *Íd.*, pág. 914.

### B. Infracciones a la Ley 22-2000

"El acto de conducir un vehículo de motor en estado de embriaguez o bajo los efectos de sustancias controladas constituye un grave peligro para nuestra sociedad, pues atenta contra el bienestar de los ciudadanos en las carreteras del País" *Pueblo v. Martínez Ladrón*, 202 DPR 409, 417–18 (2019). Es por ello que, el Artículo 7.01 de la Ley Núm. 22-2000, conocida como la *Ley de Vehículos y Tránsito de Puerto Rico* ("Ley 22-2000"), *supra*, establece la política pública del gobierno en aras de limitar o erradicar este tipo de conducta "antisocial y criminal". Artículo 7.01 de la Ley 22-2000.

En armonía con el postulado anteriormente anunciado, el Artículo 7.02 de la Ley 22-2000, dispone que en un proceso criminal por infracción a las disposiciones del precitado Artículo 7.01, aplicarán una serie de normas con relación al nivel o concentración de alcohol existente en la sangre del conductor al tiempo en que se comete la infracción. En lo pertinente, el Artículo 7.02 (a) establece que "[e]s ilegal per se, que cualquier persona de veintiún (21) años, o más, conduzca o haga funcionar un vehículo de motor, cuando su contenido de alcohol en su sangre sea de ocho centésimas del uno por ciento (0.08%) o más, según surja tal nivel o concentración del análisis químico o físico de su sangre o aliento". *Véase*, 9 LPRA sec. 5202.

Ahora bien, el Artículo 7.06 de la Ley 22-2000 establece las penalidades aplicables en caso de grave daño corporal. *Véase*, 9 LPRA sec. 5206. Como corolario de lo anterior, el precitado artículo expone que "[s]i a consecuencia de la violación a lo dispuesto en los Artículos 7.01, 7.02 o 7.03 de esta Ley un conductor le ocasiona la muerte a otra persona, incurrirá en delito grave y **se le impondrá una pena de reclusión por un término fijo de quince (15) años**"

(énfasis nuestro). *Íd.* Cabe mencionar que conforme lo establece el Artículo 7.07 de la Ley 22-2000, "[e]n todos los casos en que una persona resulte convicta por infracción a las disposiciones de los Artículos 7.01, 7.02, 7.03, 7.05, y 7.06 de esta Ley, sea por alegación de culpabilidad o luego de evaluada la prueba durante un juicio, el Tribunal **deberá dictar sentencia e imponer la sanción aplicable bajo esta Ley**" (Énfasis nuestro). *Véase,* 9 LPRA sec. 5207.

No obstante lo anterior, el Artículo 7.08 de la referida Ley 22-2000, dispone que "[e]l Tribunal podrá suspender los efectos de la sentencia de reclusión impuesta bajo este subcapítulo **con excepción de convicciones bajo el Artículo 7.06 el cual no tendrá el beneficio de una sentencia suspendida**. Tampoco estará disponible ese beneficio cuando la persona sea considerada reincidente bajo este Capítulo" (Énfasis nuestro). Véase, 9 LPRA sec. 5208.

De otra parte, el Artículo 5.07 (C) de la Ley 22-2000, 9 LPRA sec. 5127, establece lo siguiente:

> En aquellos casos en que la persona que condujere un vehículo de forma imprudente o negligentemente le ocasione la muerte a otra persona, **incurrirá en delito grave con una pena de tres (3) años de reclusión. Si la persona conducía de forma temeraria, con claro menosprecio a la seguridad, y le ocasiona la muerte a otra persona, incurrirá en delito grave con una pena fija de ocho (8) años de reclusión y una multa de cinco mil (5,000) dólares** (Énfasis nuestro).

### C. Prueba Pertinente

La Regla 401 de evidencia 32 LPRA Ap. VI, R. 401, define el concepto de prueba pertinente de la siguiente manera:

> Evidencia pertinente es aquélla que tiende a hacer la existencia de un hecho, que tiene consecuencias para la adjudicación de la acción, más probable o menos probable de lo que sería sin tal evidencia. Esto incluye la evidencia que sirva para impugnar o sostener la credibilidad de una persona testigo o declarante.

En armonía con lo anterior, la Regla 402 de evidencia, *supra,* dispone que "[l]a evidencia pertinente es admisible excepto cuando se disponga lo contrario por, imperativo constitucional, por

disposición de ley o por estas Reglas. La evidencia no pertinente es inadmisible".

Cónsono con lo previamente esbozado, la Regla 403 de Evidencia, *supra*, establece que "[e]videncia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualesquiera de estos factores:

a. riesgo de causar perjuicio indebido
b. riesgo de causar confusión
c. riesgo de causar desorientación del Jurado
d. dilación indebida de los procedimientos
e. innecesaria presentación de prueba acumulativa.

En cuanto la precitada Regla 403, el Tribunal Supremo de Puerto Rico ha aclarado que la misma debe ser usada con prudencia y cuidado por nuestros tribunales, pues, conforme lo dispone la propia Regla 402, toda prueba pertinente es admisible salvo aplique una regla de exclusión. *Pueblo v. Serrano Morales*, 201 DPR 454, 466 (2018). Así pues, el análisis que debe ejercer el foro primario es tener como eje central que "el juez determine, a su juicio y criterio, si la admisibilidad de esa prueba puede llegar a ser perjudicial para el Jurado". *Íd.* En otras palabras, "debe determinar si el perjuicio que puede llegar a causar en el jurado es mayor que el valor probatorio de la prueba que se pretende utilizar". *Íd.*

Asimismo, nuestra más Alta Curia ha establecido en cuanto al primer elemento de perjuicio indebido, que "toda prueba es 'perjudicial' en la medida que favorece a una parte y perjudica a otra, pero éste no es el tipo de perjuicio al que se refiere la regla". (cita omitida) *Pueblo v. Santiago Irizarry*, 198 DPR 35, 44 (2017).

### D. Pliego Acusatorio

En Puerto Rico, el derecho de un acusado a la debida notificación de los cargos presentados en su contra es de rango constitucional, pues ello se desprende de la Sexta Enmienda de la Constitución de Estados Unidos y de la Sec. 11 del Artículo II de la Constitución de

Puerto Rico. *Pueblo v. Vélez Rodríguez,* 186 DPR 621, 627 (2012). En tal sentido, el mecanismo con el que cuenta el Ministerio Público "para cumplir con esa obligación de notificación es el uso de la acusación o denuncia (pliego acusatorio) y que, a su vez, el Ministerio Público está obligado a entregar al acusado una copia". *Íd.*, pág. 628.

Cónsono con lo anterior, la Regla 34 de Procedimiento Criminal 34 LPRA Ap. II, R. 34, define la acusación como una "alegación escrita hecha por un fiscal al Tribunal de Primera Instancia en la cual se imputa a una persona la comisión de un delito". Por su parte, la Regla 35 de Procedimiento Criminal regula el contenido que debe tener la acusación. En lo pertinente, el inciso (c) de la precitada regla establece que la acusación debe contener lo siguiente:

> (c) Una exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común. Las palabras usadas en dicha exposición se interpretarán en su acepción usual en el lenguaje corriente, con excepción de aquellas palabras y frases definidas por ley o por la jurisprudencia, las cuales se interpretarán en su significado legal. Dicha exposición no tendrá que emplear estrictamente las palabras usadas en la ley, y podrá emplear otras que tuvieren el mismo significado. En ningún caso será necesario el expresar en la acusación o denuncia presunciones legales ni materias de conocimiento judicial.

El Tribunal Supremo de Puerto Rico ha aclarado que "[e]l propósito de la acusación "no es cumplir mecánicamente con una forma ritual, sino informar al acusado el delito que se le imputa, de tal suerte que pueda preparar adecuadamente su defensa". *Pueblo v. Pagan Rojas,* 187 DPR 465 481 (2012) citando a *Pueblo v. Meléndez Cartagena,* 106 DPR 338, 341 (1977). Por ello, pese a que no hay una forma específica para redactar las acusaciones "es imprescindible que sirva como una notificación adecuada y completa del delito imputado". *Íd.* Así pues, para que un pliego acusatorio satisfaga el mandato constitucional de la debida

notificación, es esencial que el contenido de la aludida acusación exponga los hechos constitutivos del tipo delictivo de forma que una persona de inteligencia común pueda entenderla. *Pueblo v. Vélez Rodriguez, supra*, pág. 629. En ese sentido, "para que el Ministerio Público pueda cumplir con lo anterior no se le exige ningún lenguaje estereotipado o técnico en su redacción ni el uso estricto de las palabras dispuestas en el estatuto, solo se le exige que el contenido exponga todos los hechos constitutivos del delito". *Íd.*

Ahora bien, si las alegaciones provistas en el pliego acusatorio no imputan ningún delito proveniente de las leyes de Puerto Rico, procede la desestimación de la acusación al amparo de la Regla 64 (a) de Procedimiento Criminal, *supra*. En otras palabras, si la acusación no imputa delito, se puede presentar una moción de desestimación por ese fundamento, la cual, a tenor con la Regla 63 de Procedimiento Criminal *supra*, puede presentarse en cualquier etapa de los procedimientos.

**III.**

Nos corresponde examinar los argumentos esbozados por las partes para así poder disponer la controversia ante nos. En el presente recurso, la Apelante nos solicita que revoquemos la *Sentencia* dictada y notificada el 14 de noviembre de 2024 por el foro primario. Por virtud del aludido dictamen, el foro *a quo* sentenció a la señora Alvarado Vázquez a cumplir una condena de quince (15) años de reclusión por violar varias disposiciones de la Ley 22-2000, *supra*, entre estas, el Artículo 7.06. En específico, la Apelante alega, en su primer señalamiento, que el foro primario erró al emitir un veredicto de culpabilidad contra la señora Alvarado Vázquez toda vez que no se probó la comisión de los delitos imputados más allá de duda razonable. Asimismo, en su segundo señalamiento de error, sostiene que el foro *a quo* incidió al no permitir el testimonio de la señora Mayra Vázquez Morales ("señora Vázquez Morales") mediante

el cual pretendía establecer el elemento de coacción durante el proceso de las advertencias de ley realizadas a la Apelante al momento de su arresto. De igual modo, en su tercer señalamiento de error, la Apelante arguye que el foro primario erró al no considerar imponer una pena alternativa al encarcelamiento o una combinación de estas. Por último, en su cuarto señalamiento de error, la señora Alvarado Vázquez argumenta que el pliego acusatorio por la infracción al Artículo 7.06 de la Ley 22-2000, *supra*, carece de los elementos esenciales del delito imputado, por lo cual procedería la desestimación y archivo del caso.

Por su parte, el Estado sostiene que el Ministerio Público probó más allá de duda razonable que la Apelante condujo en la autopista un vehículo de motor en estado embriaguez, en contra del tránsito e impactó por la parte frontal el vehículo que manejaba el señor Muriel Cirino, el cual, a consecuencia de dicho impacto, falleció. Igualmente, el Estado esgrime que la prueba que puede presentar la defensa en un caso criminal no es absoluta y está supeditada a que esta sea pertinente. Consta en el expediente que, el Apelado arguye que la Ley 22-2000, *supra*, expresamente dispone que la condena por grave daño corporal o muerte debe cumplirse en prisión. Veamos.

Ante este cuadro, procedemos atender el primer señalamiento de error esgrimido por la señora Alvarado Vázquez, el cual versa sobre el veredicto de culpabilidad por los delitos en contra de esta, los cuales consisten en infracción a los Artículos 5.07(C), 7.02 y 7.06 de la Ley 22-2000, *supra*. En concreto, la señora Alvarado Vázquez argumenta que los delitos que pesan en su contra no se probaron más allá de duda razonable. Para atender este señalamiento de error de forma rigurosa y cumplir cabalmente con nuestra función revisora, procederemos a exponer de manera sucinta la prueba testifical que desfiló en el juicio en su fondo.

El **4 de marzo de 2024**, el Ministerio Público sentó a testificar a **María Matos Montalvo** quien atestó ser la pareja consensual del señor Muriel Cirino.[6] Esta testigo declaró que el 4 de abril de 2021, agentes de la policía acudieron a su residencia para notificarle que el señor Muriel Cirino estaba recluido en el Hospital Menonita de Caguas.[7] Declaró que el señor Muriel Cirino se encontraba ese día en casa de su madre en el municipio de Caguas y se había traslado a ese lugar en su vehículo Jeep.[8]

Ese mismo día también declaró **Marvick Soto Muriel,** sobrino y ahijado del señor Muriel Cirino.[9] Testificó que el último día que vio a su tío fue el 4 de abril de 2021, domingo de resurrección.[10] Expresó que ese día hubo un compartir familiar en el cual estaba presente el señor Muriel Cirino.[11] Esgrimió que dicha actividad culminó a eso de las 10:30 pm.[12] Adujo que presenció cuando su tío se fue de la actividad familiar, más o menos a esa hora y cuando se montó en su vehículo de motor Jeep.[13] Mencionó que posteriormente, recibió una llamada de la señora María Matos Montalvo, quien le notificó sobre un accidente vehicular en el cual estuvo involucrado el señor Muriel Cirino.[14] Declaró que, acto seguido, acudió al hospital y allí identificó el cuerpo del señor Muriel Cirino.[15] Detalló que cuando identificó el cuerpo, la cara "estaba dividida" y en el pecho había un moretón.[16] Culminó su testimonio esbozando que el día del accidente, el señor Muriel Cirino estaba consumiendo cerveza.[17]

El último testigo que declaró el **4 de marzo de 2024** fue el agente **Luis Montañez Padilla** quien se identificó como agente de

---

[6] Véase, Transcripción de la Prueba Oral ("TPO"), pág. 13, líneas 16-23.
[7] *Íd.*, pág. 15, líneas 5-23- pág. 16, líneas 1-8.
[8] *Íd.*, pág. 17, líneas 15-23- pág. 18, líneas 1-8.
[9] *Íd.*, pág. 21, líneas 1-8.
[10] *Íd.*, pág. 22, líneas 1-5.
[11] *Íd.* líneas 1-10.
[12] *Íd.* pág. 23, líneas 1-2.
[13] *Íd.* pág. 23, líneas 4-21.
[14] *Íd.*, pág. 25, líneas 2-6.
[15] *Íd.*, pág. 25, líneas 15-23- pág. 26 líneas 1-3; línea 22.
[16] *Íd.*, pág. 27, líneas 8-10.
[17] *Íd.*, pág. 28, líneas 6-9.

Servicios Técnicos del Cuerpo de Investigaciones Criminales ("CIC").[18] Narró que a eso de las 11:30 pm recibió una llamada del retén del CIC sobre un accidente de tránsito en el expreso 52, kilómetro 21.6.[19] Adujo que se personó en el lugar del accidente con una cámara fotográfica.[20] Narró que, al llegar al lugar de los hechos, observó dos (2) vehículos de motor chocados de frente.[21] Expresó que el agente investigador del accidente, el agente Muñoz Maestre, le solicitó que tomara fotografías de la escena.[22] Esbozó, además, que acto seguido, acudió al Hospital Menonita en Caguas para tomar fotografías del cuerpo del occiso.[23] Describió que el cuerpo tenía una herida abierta en la cabeza, laceraciones y hematomas en el cuerpo.[24]

El **5 de marzo de 2024**, el Ministerio Público sentó a testificar a **Alexander Cruz Rodríguez**. Este testigo esbozó que tras estar en un compartir con varias amistades en el municipio Bayamón, a eso de las 10:30 pm, se dirigió hacia su residencia que estaba ubicada en el municipio de Coamo.[25] Narró que, para llegar a su hogar, tomó el expreso 52.[26] Explicó que mientras transitaba por esa ruta, divisó unas luces rojas por el lado contrario del expreso.[27] Manifestó que al percatarse de ese suceso, aceleró su vehículo y comenzó a tocar bocina para intentar de que el vehículo que iba en contra del tránsito reaccionara.[28] Añadió que el vehículo en cuestión, siguió su trayecto por espacio de un minuto hasta que colisionó con otro vehículo que

---

[18] *Íd.*, pág. 29, líneas 9-10.
[19] *Íd.*, pág. 30, líneas 8-11; pág. 31, líneas 1-7.
[20] *Íd.*, pág. 30, línea 20-23.
[21] *Íd.*, pág. 31, línea 14.
[22] *Íd.*, pág. 32, líneas 1-8.
[23] *Íd.*, pág. 34, líneas 1-12.
[24] *Íd.*, líneas 20-21.
[25] *Íd.*, pág. 57, líneas 7-23; pág. 58, líneas 1-2.
[26] *Íd.*, pág. 58, línea 17-18.
[27] *Íd.*, líneas 17-21.
[28] *Íd.*, pág. 59, líneas 18-21.

iba en dirección franca por el carril correcto.[29] Detalló que la colisión fue frontal.[30]

El testigo **Alexander Cruz Rodríguez** continuó su relato describiendo que la colisión fue muy fuerte.[31] Tras esto, el testigo explicó que detuvo su vehículo, activó las luces intermitentes y le solicitó a su novia, quien lo acompañaba como pasajera, que llamara al 911.[32] Narró que acto seguido, se dirigió al lugar donde ocurrió el accidente y allí se percató que los vehículos afectados eran una Mercedes color gris y "un Jeep Wrangler no muy adelantado" de color negro.[33] Asimismo, explicó que notó que el vehículo marca Mercedes tenía la puerta abierta y no tenía a nadie en su interior.[34] Esbozó que en el Jeep había un caballero inmóvil que no respondía a ningún estímulo.[35] De igual forma, narró que se percató que el Jeep comenzó a incendiarse y varias personas que se habían detenido intentaron apagar el fuego.[36] Sostuvo que, posteriormente, se trepó a una valla y se percató que había un grupo de personas socorriendo a una persona de tez blanca y pelo negro que estaba en el suelo.[37] **El testigo identificó en sala que esa persona era la señora Alvarado Vázquez**.[38] Asimismo, tras haberle mostrado varias fotografías, el testigo identificó al señor Muriel Cirino como la persona que se encontraba en el Jeep.[39]

El próximo testigo que se sentó a declarar fue **Ángel Figueroa Soto** quien se despeñaba como Director Operacional de Manejo de Emergencia el día de los hechos.[40] Declaró que el 4 de abril de 2021 a eso de las 11:10 pm recibió una llamada en la que le notificaron

---

[29] *Íd.*, pág. 60, línea 23.
[30] *Íd.*, líneas 20-23.
[31] *Íd.*, pág. 61, líneas 1-3.
[32] *Íd.*, línea 4-11.
[33] *Íd.*, líneas 19-23.
[34] *Íd.*, pág. 62, líneas 12-15.
[35] *Íd.*, pág. 62, líneas 17-20.
[36] *Íd.*, pág. 63, líneas 6-18.
[37] *Íd.*, pág. 63, líneas 22-23- pág. 64, líneas 1-17.
[38] *Íd.*, pág. 64, líneas 22-23- pág. 65, líneas 1-5.
[39] *Íd.*, pág. 66, líneas 7-17
[40] *Íd.*, pág. 90 líneas 7-14.

sobre un accidente en el expreso 52 en dirección de Cayey a Caguas y que uno de los vehículos se encontraba en llamas.[41] Atestó que, acto seguido, se dirigió al lugar del accidente y se encontró con un vehículo Mercedes color gris y un Jeep chocados de frente.[42] Expresó que en el área del paseo había una persona boca arriba, **a quien identificó en sala que se trataba de la señora Alvarado Vázquez**.[43] Describió que se aproximó a la Apelante y la percibió desorientada, aturdida y hablaba con la boca pesada.[44] Indicó que en ese momento llegaron los paramédicos y les solicitó que se mantuvieran atendiendo a la "muchacha" en lo que se dirigía hacia la otra persona que se encontraba atrapada en el Jeep.[45] Detalló que la persona atrapada dentro del aludido vehículo estaba inmóvil, por lo cual solicitó que se le suministrara oxígeno en lo que se disponían a abrir la puerta del automóvil con equipo especializado para ello.[46] Posteriormente, colocó al chofer del Jeep en una camilla y lo llevó a una ambulancia.[47]

Tras este testimonio, el Ministerio Publicó sentó a declarar a **Axel Concepción Marcano**, quien en el día de los hechos se despeñaba como paramédico.[48] Expresó que se le informó sobre un accidente en el expreso 52 y, acto seguido, se dirigió en la ambulancia al lugar del accidente.[49] Al llegar, identificó los vehículos involucrados en el accidente, siendo estos unas Mercedes y un Jeep y expuso que el choque de estos vehículos fue frontal con una magnitud la cual describió entre moderada a severa.[50] Narró que al llegar a la escena, se percató de que había una persona acostada boca arriba en el suelo a **quien identificó en sala como la señora**

---

[41] *Íd.*, pág. 93, líneas 17-20.
[42] *Íd.*, pág. 96, líneas 9-20.
[43] *Íd.*, pág. 97, líneas 3-23.
[44] *Íd.*, pág. 98.
[45] *Íd.*, pág. 99, líneas 7-21.
[46] *Íd.*, pág. 101, líneas 17-23- pág. 102, líneas 1-21.
[47] *Íd.*, pág. 103, líneas 6-21.
[48] *Íd.*, pág. 107, líneas 15-23.
[49] *Íd.*, pág. 109, líneas 16-21.
[50] *Íd.*, pág. 111, líneas 3-15.

**Alvarado Vázquez**.[51] Destacó que la Apelante no respondió las preguntas que le hizo y balbuceaba.[52] Manifestó que habían dos (2) personas heridas en la escena pero que el solo atendió a la Apelante.[53] Narró que llevó a la Apelante al Hospital Menonita en Caguas y al llegar a este sitio expresó que dejó a la Apelante a cargo del personal de enfermaría del hospital.[54]

El último testigo que declaró el **5 de marzo de 2024** fue **Ángel González Rivera,** quien al día de los hechos laboraba como paramédico.[55] Manifestó que recibió una llamada en la cual se le informó sobre un accidente en el expreso 52 y al llegar al lugar observó dos (2) vehículos de motor impactados por la parte del frente, una dama acostada el suelo en el área del paseo y un caballero dentro de uno de los vehículos.[56]

El juicio en su fondo se reanudó el **12 de julio de 2024** con el testimonio de **Maritere Rivera Sánchez**, quien al día de los hechos, se desempeñaba como químico en el Instituto de Ciencias Forenses ("ICF").[57] El testimonio de esta testigo se circunscribió a la evaluación y certificación que esta emitió el 23 de junio de 2021 sobre el análisis de la muestra patológica con la numeración 1402-21 referente al señor Muriel Cirino.[58] Explicó que el resultado de la prueba fue positivo para etanol con punto veintiocho por ciento (.28%) en sangre central y punto veinte por ciento (.20%) por peso de etanol en la prueba de humor vítreo.[59]

Posteriormente, se sentó a testificar el **Dr. Edwin López Robles** ("Dr. López Robles") quien era médico de sala de emergencia en el Hospital Menonita en Caguas.[60] Expresó que el 4 de abril de

---

[51] *Íd.*, pág. 111, líneas 21-23- pág. 112, líneas 1-13.
[52] *Íd.*, pág. 113, líneas 7-10.
[53] *Íd.*, pág. 114, líneas 1-4.
[54] *Íd.*, pág. 116, líneas 12-13.
[55] *Íd.*, pág. 127-128, líneas 13-21.
[56] *Íd.*, pág. 127, líneas 22-23- pág. 129, líneas 1-15.
[57] *Íd.*, pág. 139, líneas 9-14.
[58] *Íd.*, pág. 141, líneas 16-23- pág. 142, líneas 1-18.
[59] *Íd.*, pág. 142, líneas 19-23- pág. 143, líneas 1-22.
[60] *Íd.*, pág. 152, líneas 1-12; pág. 155, líneas 5-14.

2021, trabajó el tuno de 6:00 pm a 6:00 am y a eso de las 12:15 am recibió a un paciente en condición crítica quien tenía daño cerebral agudo y no respondía.[61] Indicó que su paciente "era Ariel Muriel" y tenía "cincuenta y cinco (55) años".[62] Además, describió que su paciente tenía un trauma en la cabeza frontal con unas laceraciones grandes y un hematoma en la región torácica.[63] Narró que a las 12:32 am el paciente ya no tenía pulso y que a las 12:46 lo declaró muerto.[64] **Manifestó que la muerte fue relacionada a los múltiples traumas a consecuencia del accidente**.[65] Indicó que atendió a la otra persona involucrada en el accidente, **a quien identificó en sala como la señora Alvarado Vázquez.**[66] Explicó que ella llegó afectada del accidente con dolor en el área pélvica y traumas en la cara.[67] La describió como letárgica y que, además, **tenía un *slurred speech* o lengua pesada**.[68] En cuanto este último concepto, explicó que se **manifiesta en personas que están intoxicadas con drogas o con alcohol.**[69]

El **10 de julio de 2024** se sentó a testificar el **agente Carlos Muñoz Maestre** ("agente Muñoz Maestre"), quien se desempeña como policía.[70] Relató que el 4 de abril de 2021, aproximadamente a las 11:13 pm, le informaron sobre un vehículo que estaba conduciendo en contra del tránsito en la autopista cerca del Centro Comercial Las Catalinas.[71] Sostuvo que en ese momento, condujo rápidamente para tomar el expreso y tratar de prevenir un accidente.[72] Expuso que pese a este esfuerzo, al llegar al kilómetro

---

[61] *Íd.*, pág. 155, líneas 5-23- pág. 156, líneas 1-7.
[62] *Íd.*, pág. 156, líneas 16-18.
[63] *Íd.*, pág. 156, líneas 19-22- pág. 157 líneas 1-5.
[64] *Íd.*, pág. 159, líneas 2-4; pág. 160, líneas 16-22.
[65] *Íd.*, pág. 161, líneas 1-3.
[66] *Íd.*, líneas 12-22.
[67] *Íd.*, pág. 162, líneas 1-6.
[68] *Íd.*, líneas 9-14.
[69] *Íd.*, pág. 162, línea 21-23-pág. 163, líneas 1-2.
[70] *Íd.*, pág. 177, líneas 1-7.
[71] *Íd.*, pág. 178, líneas 9-15.
[72] *Íd.*, pág. 179, líneas 18-19.

21.6, se encontró con un accidente.[73] Vertió para el récord que el mismo ocurrió en dirección contraria y los vehículos quedaron totalmente destrozados de frente.[74] Identificó los vehículos involucrados como una Mercedes Benz color gris y un Jeep color negro.[75] Atestó que el Jeep se encontraba en dirección correcta de Cayey a Caguas y el vehículo Mercedes se encontraba en dirección contraria, de Caguas a Cayey.[76]

Asimismo, el agente Muñoz Maestre **indicó que en el área del paseo había una persona ensangrentada a quien identificó en sala como la señora Alvarado Vázquez**.[77] Señaló que los paramédicos estaban auxiliándola mientras ella se quejaba de dolor, balbuceaba y tenía sangre en el rostro.[78] Explicó que la iluminación en la escena era buena y en cuanto a la persona que estaba en el Jeep puntualizó que se encontraba totalmente inmóvil y aparentaba estar en estado de gravedad.[79] El agente Muñoz Maestre manifestó que realizó la investigación de la escena y expresó que como parte del protocolo en accidentes graves y fatales era necesario que se realizaran pruebas de alcohol a todos los conductores involucrados.[80] Entendía que, dado a que uno de los vehículos accidentados marchaba en contra del tránsito, pudiese darse la situación en que una de las partes condujo en estado de embriaguez.[81] Además, en la escena se observó un tapón tipo colcho y un vaso de un restaurante en donde posiblemente sirven bebidas alcohólicas.[82] Igualmente, afirmó que, **según su investigación, la**

---

[73] *Íd.*, líneas 21-23.
[74] *Íd.*, pág. 180, líneas 14-15.
[75] *Íd.*, líneas 17-18.
[76] *Íd.*, pág. 180, líneas 20-22.
[77] *Íd.*, pág. 181, líneas 13-23.
[78] *Íd.*, pág. 182, líneas 7-9.
[79] *Íd.*, pág. 182, línea 22- pág. 183, líneas 1-14.
[80] *Íd.*, pág. 185, líneas 11-14.
[81] *Íd.*, líneas 14-18.
[82] *Íd.*, líneas 19-22.

**señora Alvarado Vázquez era la persona que iba conduciendo el vehículo Mercedes.**[83]

Por otro lado, en el juicio en su fondo, durante el testimonio del agente Muñoz Maestre, el Ministerio Público le solicitó al foro primario que se celebrara una vista al amparo de la Regla 109 de Evidencia, 32 LPRA Ap. VI, R. 109.[84] Tras llevarse a cabo la aludida vista, el foro primario permitió al agente Muñoz Maestre testificar sobre las declaraciones que le hizo la Apelante.[85] Sobre este particular, el agente Muñoz Maestre manifestó que al llegar al Hospital Menonita en Caguas, la Apelante se encontraba acompañada de su madre.[86] Aludió que procedió a identificarse, que le comunicó que era el agente que estaba a cargo de la investigación del accidente y que le realizó las advertencias de ley.[87] Arguyó que al explicarle verbalmente las advertencias de ley, le preguntó si entendía, a lo que la Apelante asintió con la cabeza y procedió a iniciar y firmar el documento que contenía dichas advertencias.[88] Adujo que cuando se le preguntó sobre que ocurrió en el accidente, la Apelante le contestó lo siguiente:

> [E]staba compartiendo con unas amistades en el área de Bairoa, en el área de los food trucks [...] decidió marcharse hacia su casa [...] cuando toma la carretera 52 la autopista, ella sabía que estaba conduciendo mal verdad, que iba contra el tránsito pero que no podía corregirlo. Que todo ocurrió rápido y que no recuerda verdad, nada más.[89]

El agente Muñoz Maestre testificó que mientras la Apelante hablaba, sintió **un poco de aliento a alcohol**.[90] Expresó que su comportamiento era uno tranquilo y respondió todo lo que se le preguntó.[91] De igual forma, **señaló que la muestra de sangre que se le tomó arrojó un resultado de punto catorce por ciento**

---

[83] *Íd.*, pág. 191, líneas 9-11.
[84] *Íd.*, págs. 193-203.
[85] *Íd.*, pág. 203, líneas 13-14.
[86] *Íd.*, pág. 204, líneas 1-5.
[87] *Íd.*, líneas 1-19.
[88] *Íd.*, pág. 205, líneas 7-12.
[89] *Íd.*, líneas 17-21.
[90] *Íd.*, pág. 206, líneas 9-10.
[91] *Íd.*, pág. 207, líneas 3-7.

**(.14%) de alcohol en la sangre**.[92] En cuanto al señor Muriel Cirino declaró que el Dr. López Robles le informó que había fallecido.[93] El **11 de julio de 2024,** se llevó a cabo el contrainterrogatorio al agente Muñoz Maestre, en el cual, en lo pertinente, admitió que fue en el juicio cuando por primera vez expresó que la Apelante tenía aliento a alcohol.[94] El último testimonio presentado el **11 de julio de 2024** fue el vertido por **Cecilio Ayala Figueroa,** quien era policía y expresó que preparó el croquis de la escena.[95]

El **12 de julio de 2024,** únicamente testificó la señora **Sonia Andino Ortiz** ("señora Andino Ortiz"), quien era enfermera auxiliar en una sala de emergencia en Boston Massachusetts, lugar donde reside.[96] Narró que el día de los hechos se encontraba de vacaciones en Puerto Rico.[97] Indicó que el 4 de abril de 2021 transitaba por el expreso 52 en dirección hacia San Juan con sus hijos y que a eso de las 10:30 pm a 11:00 pm presenció un accidente entre dos (2) vehículos los cuales describió como un Jeep Wrangler y una "SUV" color gris.[98] Particularizó que la "SUV" estaba en posición contraria a la que ella transitaba.[99] Declaró que al observar el accidente se bajó de su vehículo y se percató que dentro de la "SUV" había una joven y la sacó.[100] **Identificó que la joven que se encontraba dentro de la "SUV" era la Apelante**.[101] Describió que la Apelante estaba desorientada y tenía la cara ensangrentada.[102] Sobre el señor Muriel Cirino expresó que este se estaba quejando y estaba

---

[92] *Íd.*, pág. 208, líneas 1-5.
[93] *Íd.*, líneas 8-17.
[94] *Íd.*, pág. 240, líneas 12-15.
[95] *Íd.*, págs. 286-292.
[96] *Íd.*, pág. 302, líneas 5-9.
[97] *Íd.*, líneas 14-17.
[98] *Íd.*, pág. 304, líneas 11-17.
[99] *Íd.*, línea 20.
[100] *Íd.*, pág. 305, líneas 3-7.
[101] *Íd.*, líneas 8-15.
[102] *Íd.*, pág. 306 líneas 20-23.

tosiendo.[103] Aludió que grabó y tomó fotos de la escena, las cuales posteriormente entregó al agente Muñoz Maestre.[104]

Continuado los procedimientos, **el 9 de agosto de 2024**, testificó **Jessie Rodríguez Montañez,** quien al día de los hechos se desempeñaba como la Supervisora de Enfermos en el Hospital Menonita en Caguas.[105] Relató que el 5 de abril de 2021 estaba trabajando cuando llegaron dos (2) pacientes producto de un accidente de tránsito.[106] Agregó que la policía le solicitó que tomara "una muestra de alcohol" a uno de esos pacientes, a la dama en específico.[107] **Declaró que la persona a quien le tomó la muestra de sangre fue la señora Alvarado Vázquez**.[108] Expresó que tomó las muestras de sangre y se orientó tanto a la Apelante como a la madre de ésta sobre el proceso a seguir con las aludidas muestras.[109] Describió que la persona a quien se le tomó la muestra de sangre estaba alerta, orientada, adolorida y respondió a todas las preguntas que se le hicieron.[110] **Expuso que se podía percibir olor alcohol  en el aliento de la señora Alvarado Vázquez**.[111] Agregó que el comportamiento de la Apelante fue uno cooperador.[112] Expresó que la muestra de sangre la identificó con la denominación 21-0167.[113] En el contrainterrogatorio admitió que fue en el juicio la primera vez que dijo que la señora Alvarado Vázquez  olor a alcohol.[114]

Tras este testimonio se sentó a declarar el agente **Sergio González Rodríguez** ("agente González Rodríguez") quién era policía

---

[103] *Íd.*, pág. 308, líneas 6-11.
[104] *Íd.*, pág. 314, líneas 13-22- pág. 315, líneas 1-11.
[105] *Íd.*, pág. 390, líneas 5-21.
[106] *Íd.*, pág. 392, líneas 1-4.
[107] *Íd.*, líneas 8-10.
[108] *Íd.*, pág. 393, líneas 15-20.
[109] *Íd.*, pág. 394, líneas 10-17.
[110] *Íd.*, líneas 18-23.
[111] *Íd.*, pág. 396, líneas 1-5.
[112] *Íd.*, pág. 397, líneas 1-9.
[113] *Íd.*, pág. 400, líneas 15-23- pág. 401, líneas 1-16.
[114] *Íd.*, pág. 405, líneas 4-6.

y pertenecía a la División de Patrullas de autopista de Caguas.[115] Señaló que su trabajo era investigar accidentes graves y fatales y velar por el cumplimiento de la Ley 22-2000, *supra*.[116] Indicó que el 4 de abril de 2021 recibió información de un accidente entre dos (2) vehículos en la carretera 52 y manifestó que al llegar a la escena, el agente Muñoz Maestre le solicitó que recogiera los envases con los kits para la muestra de sangre, preparadas por el Departamento de Salud para detección de alcohol.[117] Explicó que esto era parte del protocolo para todo accidente grave o fatal.[118] Describió que en la escena había un Jeep que estaba en su vía franca en dirección de Caguas a San Juan impactado por la parte frontal con un vehículo Mercedes.[119] Alegó que esa Mercedes **iba en contra el tránsito y había un vaso plástico en el piso cerca de ese vehículo.**[120] Afirmó que, luego pasó "a la División", recogió los envases para las muestras de sangre para la detección de alcohol y se dirigió a la Sala de Emergencia del Hospital Menonita en Caguas en donde le indicaron donde estaban los heridos del accidente.[121]

Aseveró que como el señor Muriel Cirino había fallecido, no se le podía tomar muestras de alcohol, ya que esa tarea le correspondería al ICF.[122] Explicó que procedió a pasar donde estaba la señora Alvarado Vázquez.[123] Narró que le explicó el proceso de la muestra a la Apelante, quien estaba acompañada de sus madre.[124] Le informó que como parte del protocolo en casos de accidentes graves o fatales, el mismo dispone que toda persona involucrada en

---

[115] *Íd.*, pág. 421, líneas 20-22- pág. 422, líneas 1-11.
[116] *Íd.*, pág. 423, líneas 1-10.
[117] *Íd.*, pág. 425, líneas 1-13.
[118] *Íd.*, pág. 424, líneas 15-16.
[119] *Íd.*, pág. 425, líneas 19-22.
[120] *Íd.*, pág. 426, líneas 1-6.
[121] *Íd.*, pág. 426, líneas 20-23- pág. 427, líneas 1-20.
[122] *Íd.*, pág. 429, líneas 18-23.
[123] *Íd.*, pág. 430, líneas 1-4.
[124] *Íd.*, líneas 5-8.

estos, se le debía a tomar una prueba de alcohol.[125] También el agente González Rodríguez expresó lo siguiente:

> Que el negarse a eso...a una prueba de alcohol era un...una obstrucción a la justicia. Que en ese caso yo tendría que comunicarme con un fiscal que a su vez se iba a comunicar con un juez para expedir una prueba de allanamiento a su cuerpo. Y mediante una orden del tribunal se le iba a tomar la muestra de sangre, que como quiera nosotros íbamos a obtener la muestra de sangre. Eh...se le entregó el papel. [126]

Finalmente, señaló que durante el proceso de la toma de muestras sangre, la señora Alvarado Vázquez se mantuvo tranquila y cooperando.[127] Culminado el testimonio del agente González Rodríguez, procedió a declarar **Marisol González Alvarado.** Esta testigo afirmó ser auxiliar de laboratorio y custodia de muestras en el Departamento de Salud, además de realizar pruebas de sangre con el fin de determinar el nivel de alcohol.[128] En lo pertinente, relató sobre la muestra identificada como 21-0167, que recibió la misma, el 8 de abril de 2021, la verificó, le colocó la fecha y la hora y se la entregó al químico Salvador Fabre Rivera.[129] El último testigo en declarar el **9 de agosto de 2024** fue **Salvador Fabre Rivera**, quien atestó ser químico en el Departamento de Salud y declaró que el 27 de abril de 2021 realizó el análisis de una muestra de alcohol que le había entregado la auxiliar de laboratorio y custodia de muestra, la señora Marisol González Alvarado.[130] **Explicó el proceso y mencionó que el resultado de ese análisis dio punto catorce por ciento (.14%) de alcohol por volumen en la muestra numero 21-0167**.[131]

Así las cosas, el **13 de agosto de 2024** solamente testificó el señor **Arnaldo Vázquez González**, quien fue admitido como perito en accidentes vehicude agosto esencia, adujo que examinó los

---

[125] *Íd.*, pág. 430, líneas 15-18.
[126] *Íd.*, pág. 432, líneas 5-10
[127] *Íd.*, pág. 435, línea 22-23- pág. 436, línea 1.
[128] *Íd.*, pág. 461, líneas 10-22.
[129] *Íd.*, pág. 464, líneas 1-13; pág. 471, líneas 7-23- pág. 472, líneas 1-20.
[130] *Íd.*, pág. 477- pág. 479, líneas 1-13.
[131] *Íd.*, pág. 480, líneas1-5; pág. 482, líneas 1-16.

vehículos involucrados en el accidente y realizó un informe sobre cada uno de éstos.[132] Detalló que el impacto tanto en el vehículo Jeep Wrangler como el vehículo Mercedes Benz fue frontal.[133] En específico, detalló que en cuanto al Jeep, el mismo no tenía *airbags* de fábrica y el guía que tenía no era el original.[134] Por otra parte, el **16 de agosto de 2024** testificó **Rafael Olivo Goyita** quien era técnico forense en el ICF y expresó que tomó fotografías y colaboró durante la autopsia del señor Muriel Cirino.[135]

Posterior al testimonio de Rafael Olivo Goyita se sentó a declarar la última testigo por parte del Ministerio Público, **la doctora María Conte Miller** ("Dra. Conte Miller"), patóloga forense con más de treinta (30) años de experiencia y quien brindó su opinión pericial.[136] Explicó que la persona que hizo la autopsia del señor Muriel Cirino ya no trabajaba para el ICF ya que se mudó al estado de Florida. Conforme a lo antes expuesto, aclaró que no estaba disponible para testificar.[137] En lo pertinente, la Dra. Conte Miller emitió su opinión pericial sobre la causa de muerte del señor Muriel Cirino mediante el examen de las fotografías que se le tomaron al cadáver de este.[138] Tras brindar una detallada descripción de las heridas del difunto, la Dra. Conte Miller concluyó que la causa de muerte del señor Muriel Cirino fueron los traumas severos recibidos y la pérdida de sangre en tan poco tiempo.[139] Especificó que los daños corporales que recibió le señor Muriel Cirino fueron producto de una colisión frontal consistente en haber sido el conductor de un vehículo de motor.[140]

---

[132] *Íd.*, págs. 529-556.
[133] *Íd.*, pág. 532, líneas 14-23- pág. 543, líneas 1-21; pág. 537, líneas 12-17.
[134] *Íd.*, pág. 543, líneas 13-23- pág. 544, líneas 1-12.
[135] *Íd.*, págs. 562-569.
[136] *Íd.*, pág. 571, líneas 4-23- pág. 572, líneas 1-18.
[137] *Íd.*, pág. 573, líneas 22-23- pág. 574, líneas 1-17.
[138] *Íd.*, pág. 574, líneas 18-22- pág. 575, líneas 1-16.
[139] *Íd.*, pág. 584, líneas 15-17.
[140] *Íd.*, pág. 584, líneas1-8.

Tras culminar el testimonio de la Dra. Conte Miller, el Ministerio Público sometió su caso. La prueba testifical de la defensa comenzó a desfilar ese mismo **16 de agosto de 2024**, con el testimonio de la señora **Johana Oyola Rosado** ("señora Oyola Rosado"). Esta testigo declaró que para el 4 de abril de 2021 residía en el Residencial Villa del Rey en Caguas.[141] Adujo que a eso de las 11:00 pm estaba en el balcón de su hogar que daba hacia la autopista 52 en dirección de Cayey a Caguas cerca de la salida 21 y manifestó que escuchó un golpe fuerte.[142] Narró que acto seguido, vio como un vehículo color negro venía a alta velocidad.[143] También manifestó lo siguiente:

> Ok. Iba... iba dando como bandazos como si se estuviera de esta forma, y de pronto hace este movimiento, sale volando, da una vuelta en el aire, el motor se voltea hacia abajo, golpea contra la valla, la valla lo rebota, da una vuelta, cae en sus gomas, se sacude, se prende en fuego el motor y la parte trasera del vehículo quedó hacia la valla.[144]

Afirmó que su apartamento quedaba en un segundo piso y frente a este no había ninguna constricción.[145] En el contrainterrogatorio, manifestó que no pudo observar el primer impacto y que solo escuchó un sonido fuerte.[146] Aceptó que el Jeep terminó **en el kilómetro 21, que esa ubicación no quedaba frente a su apartamento y que esa área se veía con dificultad.**[147]

La última persona en testificar **el 16 de agosto de 2024** fue **Ángel Torres Muñoz** quien manifestó ser el esposo de la señora Oyola Rosado.[148] Indicó que el día de los hechos, escuchó un cantazo, salió y oyó a su esposa llamar a 911.[149] Narró que su esposa se puso nerviosa en la llamada telefónica y el continuó brindándole

---

[141] *Íd.*, pág. 608, líneas 10-18.
[142] *Íd.*, pág. 609, líneas 3-22.
[143] *Íd.*, pág. 610, líneas 12-17.
[144] *Íd.*, pág. 611, líneas 7-11.
[145] *Íd.*, pág. 614, líneas 3-8- pág. 615, líneas 3-4.
[146] *Íd.*, pág. 625, líneas 1-8.
[147] *Íd.*, pág. 629, líneas 9-23- pág.630, líneas 1-7.
[148] *Íd.*, pág. 647, líneas 1-3.
[149] *Íd.*, líneas, 11-21.

información al personal del 911.[150] En el contrainterrogatorio admitió que **no vio el accidente y que solo escuchó un golpe.**[151]

Según se desprende del expediente y de la transcripción de la vista, el **22 de agosto de 2024**, el Ministerio Público y la representación legal de la Apelante sostuvieron una discusión sobre la procedencia del testimonio de la señora Vázquez Morales, la madre de la señora Alvarado Vázquez, en lo concerniente al momento en que se tomaron las muestras de sangre de la Apelante.[152] Tras haber expuestos sus respectivos puntos, el foro primario determinó que "el rulling del tribunal va a ser que ella se siente a declarar, podrá declarar de la condición en la que se encontraba su hija, pero el entrar en los pormenores de la intervención para la muestra de sangre y la embriaguez, le tribunal no lo va a permitir".[153] Cabe mencionar que este asunto referente a la limitación del testimonio de la señora Vázquez Morales se atenderá con mayor profundidad más adelante en esta *Sentencia*, pues el segundo señalamiento de error versa sobre ese asunto y se atenderá de manera separada.

Así las cosas, el **27 de agosto de 2024** se sentó a testificar la señora la señora Vázquez Morales. Narró que el 4 de abril de 2021 a eso de las 11:18 pm, recibió una llamada de su hija, la cual le informó que tuvo un accidente vehicular y tenía que llegar al Hospital Menonita de Caguas.[154] Sostuvo que presenció a su hija ensangrentada y con mucho dolor.[155]

Culminado el testimonio de la señora Vázquez Morales, la Apelante se sentó a testificar y declaró lo siguiente:

> Ese día luego de ir a mi trabajo como de costumbre, a San Juan, eh... luego salgo de mi trabajo eh... y ya luego cuando estoy por el área de Caguas me dirijo hacia a comer. Luego

---

[150] *Íd.*, pág. 651, líneas 14-20.
[151] *Íd.*, pág. 657, líneas 1-15.
[152] *Íd.*, pág. 663, líneas3-23- pág. 665 línea 1-20.
[153] *Íd.*, pág. 667, líneas 13-18.
[154] *Íd.*, pág. 695, líneas 7-11.
[155] *Íd.*, pág. 694, líneas 13-21.

salgo en la Salida 18 eh ahí doblo a la izquierda... nuevamente en la luz doblo a la izquierda para ir al restaurante Tijuanas a comer. Eh ... como, luego ahí cuando salgo que estoy en la luz doblo a mano derecha eh... luego caigo en la otra luz y ahí en la 196, en esa luz estaba bien oscuro, no había rotulación y ya cuando entro... entro... doblo ahí a mano izquierda que luego me topo con eh... con el acci... con un accidente y ahí no recuerdo más.[156]

En el contrainterrogatorio, la Apelante **admitió que el día de los hechos conducía una Mercedes**,[157] que el accidente "con el que se topó" fue en la autopista 52 en dirección de Cayey a Caguas,[158] que no recordaba si su vehículo había quedado en contra del tránsito y que no recordaba el vehículo contra el cual chocó.[159] **Admitió que ciertamente había chocado**.[160] Igualmente, la Apelante admitió que la ruta de Cayey a Caguas en la autopista 52 no le era extraña pues había transitado por ésta en innumerables ocasiones.[161]

Luego del testimonio de la Apelante, declaró el señor **Misael Cuevas Quintana** quien fungía como director de autopista de Puerto Rico. Su testimonio se limitó a esbozar que ordenó a fabricar rotulación que hacía falta en la salida 18 del expreso 52 en Caguas, ubicada en la intersección en la carretera 196.[162]

Acto seguido, la defensa presentó su último testigo, **Héctor Delgado Rodríguez.** Este testificó como perito en accidentes de tránsito.[163] Mencionó que al hacer su análisis observó el croquis, las fotografías, los informes y declaraciones del expediente.[164] Explicó que hacía su análisis retrotrayendo los eventos.[165] Relató que conforme la información recopilada en su investigación, la Apelante entró por la salida 18, la cual no tenía rotulo alguno.[166] Detalló que

---

[156] *Íd.*, pág. 702, líneas 22-23- pág. 703, líneas 1-7.
[157] *Íd.*, pág. 710, líneas 2-3.
[158] *Íd.*, pág. 712, líneas 18-23- pág. 713 línea 1.
[159] *Íd.*, pág. 713, líneas 13-22.
[160] *Íd.*, pág. 713, línea 23- pág. 714 línea 1.
[161] *Íd.*, pág. 703, línea 723- pág. 704 línea 1-9.
[162] *Íd.*, págs., 721-726.
[163] *Íd.*, pág. 734 líneas 6-10.
[164] *Íd.*, líneas 14-16.
[165] *Íd.*, pág. 735, líneas 6-9.
[166] *Íd.*, pág. 736 líneas 5-15.

el accidente fue causado por falta de rotulación o señalamiento de no entre.[167] En específico, concluyó lo siguiente:

> Eh...determiné y concluyo, que debido a la falta de rotulación o señalamiento de no entre...eh... doña Johana...doña Carola entró por una salida indebida el cual vino a caer en unos carriles que conducían de Cayey a San Juna o a Caguas...y lamentablemente se encontró con don Ariel, el cual ya había tenido, de acuerdo con doña Johana, dos impactos frontales grandes...mas [sic] el tercero que tiene con ella. Eso se llama que es una escena prolongada. Tenemos entonces una situación que tenemos que pensar si don Ariel lamentablemente pudo haber muerto por los cantazos de impacto que recibió en los primeros dos impactos.[168]

Con este testimonio, la defensa dio por sometido su caso. Por otra parte, además de la prueba testifical previamente reseñada, el foro primario admitió la siguiente prueba documental en el juicio:

> De parte del Ministerio Público se admitió:
>
> Exhibit 1 45 fotos a color del lugar del accidente
>
> Exhibit 2 11 fotos a color del occiso
>
> Exhibit 3 Documento Médico Legal *Patient Care Report* de Carola del Mar Alvarado
>
> Exhibit 4 Certificado de Análisis PAT-1402-21 Preparado por Maritere Rivera Sánchez, Químico del 24 de junio de 2021
>
> Exhibit 5 Advertencias Miranda para persona sospechosa en custodia firmada por Carola M. Alvarado Vázquez
>
> Exhibit 6 Copia notas del agente Carlos Muñiz Maestre
>
> Exhibit 7 Copia informe escena choque grave o fatal
>
> Exhibit 8 Copia Informe de Choque de Tránsito descripción de hechos
>
> Exhibit 9- Croquis
>
> Exhibit 10- DVD-R smartbuy 16x, 4.7 gb, 120 min.
>
> Exhibit 11- Parte de remisión muestra 21-0167
>
> Exhibit 13 Etiqueta del envase con fecha del 8 de abril de 2021
>
> Exhibit 14 Copia de las bitácoras
>
> Exhibit 15 Informe de Análisis toxicológico del 8 de abril de 2021, muestra 21-0167
>
> Exhibit 16 Informe de inspección de vehículos de accidentes graves Núm. 00-21358 de vehículo marca Mercedes Benz del año 2016
>
> Exhibit 17 Informe de inspección de vehículos de accidentes graves Núm. 00-21357 de vehículo marca Jeep modelo Wrangler del 1989
>
> Exhibit 18 fotografías a color en papel
>
> Exhibit 19 fotografías a color en papel
>
> Exhibit 20 Copia de Registro de Identificación de fotografías

---

[167] *Íd.*, pág. 766 líneas 4-13.
[168] *Íd.*

Exhibit 21 CD (autopsia)

Exhibit 22 Opinión Pericial, PAT2021-01402, Nombre Occiso Ariel Muriel Cirino

Como prueba estipulada se admitió:

Exhibit 1 Certificación duplicado de grabación de llamadas 911

Exhibit 2 CD YOP 8560 (Llamada 911)

Exhibit 3 Certificación del DTOP del 17 de mayo de 2022

Finalmente, como prueba de la defensa se admitió:

Exhibit 1 Dos fotos a color en papel 8 1/2

Con este recuento presente, procedemos a resolver. Nos corresponde evaluar si el foro primario incidió al emitir el veredicto de culpabilidad por los delitos imputados contra la Apelante más allá de duda razonable. Aclaramos que el concepto *más allá de duda razonable* se refiere a aquella insatisfacción o intranquilidad en la conciencia del juzgador sobre la culpabilidad del acusado una vez desfilada la prueba. *Pueblo v. García Colon I, supra.* La prueba presentada en el juicio **demostró** que el 4 de abril de 2021, aproximadamente a las 11:10 pm hubo un accidente de tránsito entre un vehículo Mercedes-Benz color gris y un vehículo Jeep color negro. **La persona que conducía el vehículo Mercedes-Benz fue la señora Alvarado Vázquez**. Ello quedó demostrado a través del testimonio de la señora Andino Ortiz, quien declaró haber ayudado a la Apelante a bajarse del vehículo tras haber colisionado con el Jeep; de la investigación efectuada por el agente Muñiz Maestre, la cual identificó a la Apelante como la conductora del vehículo y del propio testimonio de la Apelante quien **admitió que el día del accidente manejaba el vehículo de motor Mercedes-Benz previo al accidente objeto del mismo**.

Ahora bien, la prueba desfilada también **demostró que la Apelante condujo el vehículo bajo los efectos bebidas embriagantes**, pues como parte del protocolo en casos de investigaciones de accidentes de tránsito, se le realizó la prueba de

alcohol correspondiente a la señora Alvarado Vázquez, y esta arrojó el resultado de punto catorce por ciento (.14%) de alcohol por volumen. Esto fue corroborado mediante el testimonio de los agentes Muñoz Maestre y González Rodríguez, quienes estuvieron a cargo de ordenar la toma de la muestra de sangre para la prueba de alcohol; el testimonio de la señora Jessie Rodríguez Montañez, quien fue la enfermera que tomó las muestras de sangre a la Apelante y el testimonio de Marisol González Alvarado y Salvador Fabre Rivera, químicos a cargo de hacer el análisis de las muestras de sangre. Además se demostró que la Apelante contenía una concentración de alcohol mayor a la permitida por ley conforme lo dispone el Exhibit 15 del Ministerio Público, Informe de Análisis Toxicológico emitido el 8 de abril de 2021, muestra 21-0167.

Conforme a la prueba testifical y documental presentada y admitida, colegimos que **fueron probados más allá de duda razonable los elementos del delito imputado**, **por lo que se configuró la infracción al Artículo 7.02 de la Ley 22-2000,** ***supra,*** el cual dispone que es ilegal *per se* que cualquier persona mayor de veintiún años conduzca un vehículo de motor con un contenido de alcohol en la sangre de ocho centésimas del uno por ciento (0.08%) o más.

Por otro lado, cónsono con la prueba desfilada y admitida en el juicio, se demostró que la señora Alvarado Vázquez condujo en contra del tránsito. Ello quedó constatado mediante el testimonio vertido por Alexander Cruz Rodríguez, quien presenció que el vehículo Mercedes Benz que condujo la Apelante transitaba en contra del tránsito en el expreso 52 y los testimonios de las personas que trabajaron la escena, observaron que el choque, y esbozaron para el récord que el mismo fue frontal y el vehículo Mercedes-Benz estaba en una posición en contra del tránsito.

En específico, fueron ilustradores los testimonios de las siguientes personas que trabajaron o se encontraban presentes en la escena:  el agente  Ángel Montañez Padilla quien acudió a la escena a tomar fotografías del accidente; Alexander Cruz Rodríguez, quien presenció el accidente; Ángel Figueroa Soto, quien acudió a la escena como rescatista; Axel Concepción Marcano y Ángel González Rivera, quienes acudieron a la escena como paramédico; los agentes Muñoz Maestre, Cecilio Ayala y el agente González Rodríguez quienes acudieron a la escena como agentes investigadores y la señora Andino Ortiz, quien estuvo presente en la escena para tratar de socorrer a las personas involucradas. Igualmente, la fotos y videos de la escena tomadas por la señora Andino Ortiz, **fueron reveladoras en cuanto a ilustrar al tribunal y evidenciar, que el accidente fue frontal**. Dichas imágenes fueron admitidas como evidencia, convirtiéndose en el Exhibit 10 del Ministerio Público. Del mismo modo, el Exhibit 1 del Ministerio Público, el cual consta de cuarenta y cinco (45) fotos a color del lugar del accidente, proyectaron **de manera clara que el accidente en cuestión fue uno frontal.** A su vez, fueron relevantes los testimonios de la señora Andino Ortiz, de Axel Concepción Marcano, de Alexander Cruz Rodríguez, de Ángel Figueroa Soto y del agente Muñoz Maestre, quienes **identificaron a la Apelante en sala como la persona que se encontraba en el vehículo Mercedes Benz que fue parte del accidente**.

Si bien, la prueba demostró que, de igual manera, el señor Muriel Cirino manejó ilegalmente su vehículo de motor, pues los resultados de la prueba de alcohol que se le realizaron a este, arrojaron entre un punto veinte por ciento (.20%) a punto veinte ocho por ciento (.28%) de alcohol por volumen, este condujo por vía franca en **la dirección correcta,** entiéndase de Cayey a Caguas hasta que se topó con el vehículo Mercedes-Benz manejado por la

Apelante en dirección contraria al tránsito, y con una concentración de alcohol en la sangre mayor al porciento dispuesto por ley.

La prueba desfilada **demostró,** además, que, como resultado de este accidente, el señor Muriel Cirino recibió traumas severos. El médico que lo atendió en el hospital, el Dr. López Robles, narró que éste llegó en estado crítico, y apenas transcurridos unos minutos desde que fue ingresado a la institución médica, **falleció a consecuencia de las heridas causadas por el accidente**. Cónsono con lo anterior, la perito del Estado, la Dra. Conte Miller, mediante su análisis pericial, concluyó que la causa de la muerte del señor Muriel Cirino **fue a consecuencia de los severos traumas causados por el accidente de tránsito**.

Conforme a esta prueba, **podemos colegir más allá de duda razonable** que la razón de la muerte del señor Muriel Cirino fue las **graves heridas** ocasionadas por el **accidente de tránsito** causado por la Apelante, **quien condujo su vehículo de motor bajo los efectos de bebidas embriagantes** y en contra del tránsito. Nótese que, con estos hechos probados, se configuraron los elementos del delito conforme a lo dispuesto en el Artículo 7.06 de la Ley 22-2000, *supra*. Cónsono con lo anterior, el Artículo 7.06 establece que si a consecuencia de una violación a lo dispuesto en los Artículos 7.01, 7.02 o 7.03 de la aludida Ley, un conductor le causare la muerte a otra persona, incurrirá en delito grave. Por los fundamentos expuestos que anteceden, la prueba demostró más allá de duda razonable que la Apelante cometió una infracción al Artículo 7.02, entiéndase, manejar vehículo de motor bajo los efectos de bebidas embriagantes. Asimismo, la prueba también demostró más allá de duda razonable que, como consecuencia de la comisión de ese delito, entiéndase, conducir un vehículo de motor en estado de embriaguez, ocasionó la muerte del señor Muriel Cirino.

Del mismo modo, la conducta descrita anteriormente, sostiene los elementos del delito descritos en el Artículo 5.07 (C) de la Ley 22-2000, *supra*, el cual dispone que "[s]i la persona conducía de forma temeraria, con claro menosprecio a la seguridad, y le ocasiona la muerte a otra persona, incurrirá en delito grave." Claramente, la conducta desplegada por la Apelante, entiéndase, manejar en estado de embriaguez y en contra del tránsito, constituyó una actuación temeraria y en grave menosprecio de la seguridad que culminó con la muerte de una persona. Por consiguiente, reiteramos que la prueba presentada por el Ministerio Público **probó más allá de duda razonable** los delitos imputados a la Apelante. **Por lo cual, el primer señalamiento de error no se cometió.**

Atendido lo anterior, le corresponde a este Curia resolver el segundo señalamiento de error esgrimido en este recurso. Sostiene la Apelante que el foro primario erró al no permitir que la señora Vázquez Morales testificara sobre la manera presuntamente coaccionada en la cual se obtuvo la prueba de alcohol que le realizaron a la señora Alvarado Vázquez. Surge de la prueba ante nos, que el **22 de agosto de 2024**, en el juicio en su fondo, se dio el siguiente intercambio entre las partes y la juez que presidió los procedimientos:

> JUEZ: Ok. Con relación... lo otro que el tribunal quería discutir, porque sabemos que el licenciado tiene una testigo anunciada que es la madre de doña Carola...
>
> LCDO. LOZADA: Eso es así.
>
> JUEZ: Que yo debo entender, el licenciado me corrige, que ella vendría a declarar sobre aspectos en cuanto a la toma de muestra y la situación del hospital.
>
> LCDO. LOZADA: Eso es así, juez.
>
> JUEZ: A raíz de lo resuelto en el caso de Álvarez de Jesús, ¿cómo usted entiende que ese testimonio debe desfilar ante el jurado?
>
> LCDO, LOZADA: El caso de Álvarez de Jesús trata juez, de una orden de registro y allanamiento con relación a la prueba de sangre.
>
> JUEZ: Ujum.

LCDO. LOZADA: Aquí no es con relación a un orden de allanamiento. Es a la voluntariedad de la prueba. Es lo que va a tratar. Lo que pasó con relación a eso.

JUEZ: Precisamente el caso habla de que, si no hay voluntariedad, hay una ley especial que es la ley de vehículos y tránsito que establece que todo individuo la que se monte en un vehículo a conducir dio su anuncia a que se le tome una prueba. Por eso es que le pregunto.

LOZADA: Conforme al artículo 7.09.

JUEZ: Pues...pues entonces ¿qué puede aportar esa testigo?

LCDO. LOZADA: Ella... ella va a aportar honorable juez, lo que ella vivió allí con Carola, lo que ella vio, lo que pasó, por eso... como es parte de nuestro derecho traer prueba...a traer...a traer que sea compulsoria conforme al artículo (incomprensible) de la Constitución, estamos citando a doña Mayra para que el jurado conozca lo que pasó allí de la voz de doña Mayra.

FISCAL: El problema ahora con esa prueba como bien usted dijo honorable juez, en el caso resiente [sic] el Tribunal Supremo, lo que pasa es que va a traer una prueba y que va a confundir al jurado. Porque ciertamente no es un elemento que debe considerar el tribunal para entender si hay una voluntariedad o no. Entonces vamos a traer un testimonio que no debe ser considerado a la luz de lo resuelto a la luz de lo resuelto en el caso Álvarez de Jesús. Así que nosotros entendemos que no es necesario traer ese testimonio y si se trae puede traer una situación de confusión al jurado sobre que el estado tenía que hacer algo que en ley no procede.

JUEZ: Eso es precisamente lo que le estoy preguntando a la defensa.

LCDO. LOZADA: Nosotros entendemos que el jurado tiene que tener toda la prueba. No solamente la del ministerio público que es al que le toca probar el caso más allá de duda razonable, sino que cuando la defensa decide traer prueba que el jurado la considere, la evalúe y le de justo valor. Le dé el valor probatorio que ellos entiendan como juzgadores de los hechos. Ella viene a hablar de unos hechos. Y conforme a eso es que la estamos trayendo, honorable juez.

JUEZ: Y por eso...

LCDO. LOZADA: Conociendo lo que dice la jurisprudencia que acaba de salir.

JUEZ: Por eso, pero...me acaba de decir el compañero abogado que **ella va a hablar sobre la voluntariedad. Y si es eso el tribunal entiende que no es pertinente** ese testimonio porque está claro en la jurisprudencia reciente que la voluntariedad para este tipo de caso que es muestra de sangre, se brindó por la dama una vez ella condujo el vehículo de motor.

FISCAL: **Y de hecho, ella... surge de... de la decisión del** apelativo de este caso, **surge lo que declaró doña Mayra. Que es precisamente eso, juez.**

JUEZ: **Que también eh...fue revocada la...**

FISCAL: Claro.

LCDO. LOZADA: La supresión de evidencia.

JUEZ: **La determinación de supresión**.

LCDO. LOZADA: Nosotros entendemos que el jurado entienda...cual fue la participación de doña Mayra desde que llegó al hospital, que vio a Carola llegar en la ambulancia, en las condiciones que la vio, lo que pasó con la toma de la

muestra, lo que pasó con las advertencias de ley hechas por Sergio González. Lo que pasó con las advertencias de ley hechas por el Agente Muñoz. Lo que pasó después. Eso es necesario que el jurado.

JUEZ **Que conforme al caso tampoco son meritorias porque ya el agente no tiene ni que advertirle al ciudadano** (Énfasis nuestro).[169]

Tras este intercambio, el foro primario permitió el testimonio de la señora Vázquez Morales **únicamente en cuanto a la condición en la cual se encontraba su hija y no permitió entrar en los pormenores de la intervención para la muestra de sangre y la prueba de embriaguez al amparo de lo resuelto en** *Pueblo v. Alvarez De Jesús Pueblo v. Álvarez De Jesús*, 214 DPR ___, 2024 TSPR 87 (2024), hacía ese testimonio inoperante.[170]

Posteriormente, el **27 de agosto de 2024**, la representación legal de la Apelante solicitó reconsideración, en corte abierta, ante la negativa del foro primario de permitir el testimonio de la señora Vázquez Morales a los efectos de discutir cómo fue la muestra de sangre para la prueba de alcohol.[171] Esgrimió que, lo que quería demostrar era que la señora Alvarado Vázquez fue coaccionada psicológicamente. El foro primario denegó esta solicitud y le brindó la oportunidad a la Apelante a que hiciera una oferta de prueba la cual transcribimos:

Por eso es que va a testificar sobre los hechos que acontecieron y nuestra oferta de prueba, luego de haberle pedido reconsideración en la mañana de hoy de aquella decisión del jueves a la que usted se reafirma, es que el policía Sergio González fue específico en decirle a Carola en presencia de su mamá que si no se hacía la prueba le iba a ir peor. Que la iban a arrestar y que la iban a llevar donde un juez. Eso se llama coacción. Y ante esa coacción y luego que Carola con su cabeza moviera de un lado a otro diciendo que no, le hicieron la muestra.[172]

---

[169] Véase, TPO, pág. 663, líneas 3-23- pág. 665 línea 1-20
[170] *Íd.*, pág. 667, líneas 13-18.
[171] *Íd.*, pág. 675, líneas 8-22- pág. 676, línea 1-9.
[172] *Íd.*, pág. 676, línea 21-23- pág. 677 líneas 1-4.

Tras evaluar los argumentos presentados por la Apelante, determinamos que coincidimos con la apreciación del foro primario en cuanto la falta de pertinencia del testimonio de la señora Vázquez Morales en este caso. En torno al asunto de la voluntariedad, tanto la Ley 22-2000, *supra*, en su Artículo 7.09 como la opinión reciente de nuestro Tribunal Supremo en *Pueblo v. Álvarez De Jesús*, *supra*, pág. 27 disponen que el consentimiento para que una persona se someta a una prueba de alcohol, se concretiza en el momento en el que una persona transita por las vías públicas en un vehículo de motor.

No empece a lo antes expuesto, el argumento de la coacción y voluntariedad expuesto por la Apelante fue debidamente atendido por esta Curia en el caso KLCE202300767. En aquella ocasión dispusimos lo siguiente:

> En cuanto a las alegaciones relacionadas a que la Recurrida fue coaccionada a firmar los documentos, no estamos de acuerdo con las expresiones del foro primario. Surge de la regrabación de la vista, que la Sra. Vázquez declaró que su hija realizó un movimiento de su cabeza de izquierda a derecha al momento en que se le increpó sobre la realización de la prueba. Sostuvo que en ese momento el agente González le manifestó que si se negaba a realizarle la prueba le iría peor, que la arrestaría y que buscaría un juez. A pesar de que el agente González admite haberle manifestado a la Recurrida sobre que tendría que buscar a un fiscal, para buscar una orden judicial ante un juez, este declaró que sus expresiones no fueron en tono amenazante. Testificó que le explicó a la Recurrida el protocolo para accidentes graves, el cual incluía advertirle que si se negaba a realizarse la prueba tendría que consultar a un fiscal y posteriormente acudir ante un juez para diligenciar la orden.
>
> [...]
>
> De un examen de la totalidad de las circunstancias que rodean este caso, no albergamos duda que actuó erradamente el foro primario al suprimir la evidencia en controversia. Los testimonios vertidos en la vista de supresión de evidencia **no demuestran que haya mediado coacción de parte de los agentes del orden público al momento de la toma de la muestra de la sangre y la firma de las advertencias.** Tampoco se puede demostrar contundentemente que los agentes le hayan realizado falsas representaciones a la Recurrida sobre el proceso. Además, surge de los testimonios vertidos en sala que la Recurrida no se encontraba bajo custodia, se encontraba en un lugar público y le fueron realizadas las advertencias de rigor. Asimismo, es menester destacar que, contrario a lo resuelto por el foro primario, los agentes de la Policía no tenían el deber de advertirle a la Recurrida que esta tenía derecho a no consentir la prueba, pues **el ordenamiento solo requiere**

> **que se demuestre la necesidad legítima de realizar el registro y la ausencia de coacción física o psicológica.** Véase *Pueblo en el interés del menor N.O.R., supra* (Énfasis nuestro). [173]

Nótese que ya esta Curia evaluó y emitió un dictamen en torno a si hubo coacción o no al momento de la toma de las muestras de sangre. Por tanto, no procede atender el error esbozado, ya que este foro emitió una determinación a esos fines que resulta ser la ley del caso.

Tal y como señalamos, la Apelante levanta un tercer señalamiento de error, el cual versa sobre la evaluación de una pena alternativa en el caso de autos. La Ley 22-2000, *supra,* es una legislación especial la cual tipifica ciertas conductas como delito mientras se conduce un vehículo de motor. En específico, el Artículo 7.07 instruye a los tribunales de Puerto Rico como imponer las penas de ciertas conductas punibles tipificadas en esta legislación. En lo pertinente, el mencionado Artículo dispone:

> En todos los casos en que una persona resulte convicta por infracción a las disposiciones de los Artículos 7.01, 7.02, 7.03, 7.05, y 7.06 de esta Ley, sea por alegación de culpabilidad o luego de evaluada la prueba durante un juicio, el Tribunal **deberá** dictar sentencia e imponer la sanción aplicable bajo esta Ley (Énfasis nuestro).

Es de observar que, de una lectura de la precitada disposición legal, se desprende **claramente** que los tribunales **están obligados** a aplicar las sanciones expuestas en la propia Ley 22-2000, *supra.* El verbo "deberá" contenido en este apartado no provee espacio discrecional a los foros sentenciadores a aplicar penas fuera de Ley 22-2000, *supra.* Es menester recordar que cuando "el legislador se ha manifestado con un lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa". *Vázquez y otro v. Consejo de Titulares y Junta de Directores del Condominio*

---

[173] Véase, KLCE202300767, *Sentencia* dictada el 21 de agosto de 2023, págs. 21-23. Cabe aclarar que la Apelante recurrió de este dictamen al Tribunal Supremo de Puerto Rico mediante *Petición de Certiorari,* pero dicho recurso fue declarado *No Ha Lugar* el 17 de noviembre de 2023.

*Los Corales y otros*, 215 DPR___ (2025), 2025 TSPR 56, pág. 16 (2025). En vista de lo anterior, es forzoso concluir que los tribunales **no pueden imponer penas que no estén incorporadas** en la Ley 22-2000, *supra.*

Vale destacar que, el Artículo 7.06 de la Ley 22-2000, *supra*, dispone que quien violente dicha disposición se le impondrá **una pena de reclusión por un término fijo de quince (15) años**. Por otra parte, el Artículo 7.08 de la Ley 22-2000, *supra*, prohíbe que se suspendan los efectos de las sentencias por convicción impuestas al amparo del Artículo 7.06. En otras palabras, **la única sanción descrita** en la Ley 22-2000, *supra*, para un conductor que manejando un vehículo de motor en estado de embriaguez, y que le ocasiona la muerte a otra persona, **es la reclusión por un término fijo de quince (15) años**, la cual, los tribunales de instancia están **obligados a imponer**, sin espacio a discreción alguna para aplicar otra pena. Por consiguiente, el foro *a quo* no incidió al imponer la pena apelada, por tanto, como corolario de ello, el tercer señalamiento de error no se cometió.

Finalmente nos resta atender el cuarto señalamiento de error esbozado por la Apelante incluido en el en el *Alegato de la Apelante* presentado el 14 de abril de 2025. En el mismo arguye por primera ocasión la insuficiencia en el pliego acusatorio presentado contra la señora Alvarado Vázquez, en el cual se le imputa haber cometido una infracción al Artículo 7.06 de la Ley 22-2000, *supra*. Referente a este argumento, es menester resaltar la reiterada norma de que esta Curia no puede ejercer su función revisora en controversias que no han sido presentadas ante el foro primario. *Véase*, *Ortiz v. Holsum,* 190 DPR 511, 527 (2014); *Depto. de la Familia v. Shrivers Otero,* 145 DPR 351, 358 (1998).

Luego de evaluado el expediente ante nos, los autos originales del caso y la transcripción de la prueba oral estipulada, es evidente

que la Apelante no levantó ante el foro primario el argumento respecto a defectos en los pliegos acusatorios. Si bien una solicitud de desestimación al amparo de la Regla 64 (a) de Procedimiento Criminal, *supra*, es de carácter privilegiado y se puede presentar en cualquier etapa de los procedimientos, le correspondía a la Apelante instar la aludida solicitud ante el foro *a quo* previo a imputar la comisión de un error de un asunto que dicho foro ni tan si quiera ha atendido. Así las cosas, lo antes expuesto implica que el cuarto error esbozado por la Apelante fue traído a destiempo pues no existe determinación alguna por parte del foro primario referente a defectos en el pliego acusatorio.

**IV.**

Por los fundamentos expuestos, **confirmamos** la *Sentencia* Apelada.

Lo acordó y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones